# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 7, 2013

No. 11-60431

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

KEITH M. KENNEDY; J. LARRY KENNEDY; MARK J. CALHOUN,

Defendants - Appellants

Appeals from the United States District Court
for the Southern District of Mississippi

Before JOLLY, JONES, and GRAVES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This case arises from an elaborate scheme contrived by Mark Calhoun ("Calhoun"), with the help of Keith Kennedy and Larry Kennedy, to fraudulently obtain mortgage loans. The defendants now appeal their convictions for conspiracy to commit mail and wire fraud,[1] substantive wire fraud,[2] conspiracy to commit money laundering,[3] and promotional money laundering.[4] The primary

---

[1] 18 U.S.C. § 1349 (2006).

[2] 18 U.S.C. § 1343 (2006).

[3] 18 U.S.C. § 1956(h) (2006).

[4] 18 U.S.C. § 1956(a)(1)(A)(i) (2006).

No. 11-60431

issue we address arises in the context of the money laundering convictions and relates to the alleged merger of two crimes into a single crime; here, whether the wire fraud convictions and money laundering convictions merged to result in convictions for two crimes on the same facts, when the facts will support only convictions for wire fraud. Because we find that the wire fraud convictions did not merge with the money laundering convictions, and because we otherwise find no reversible error, we AFFIRM the judgments and convictions on all counts.

## I.

Calhoun was a licensed home mortgage loan originator and a preacher who fleeced the flock. Larry and Keith Kennedy (collectively, "Kennedys"), who operated a loan closing business, Loan Closing and Title Service ("LCTS"), helped with the shearing. Calhoun established an arrangement in which he would secure borrowers to make fraudulent applications for mortgage loans and, once the loans were approved, the lenders would wire the money to LCTS. In turn, LCTS funneled hundreds of thousands of dollars back to Calhoun by paying liens against the mortgage properties that were fraudulently claimed by corporations Calhoun owned; Calhoun then transferred much of the proceeds into schemes to secure additional fraudulent loans. The defendant Kennedys were involved in the scheme of processing the loans and disbursing the funds through LCTS.

Calhoun initiated the scheme by convincing borrowers with good credit to secure loans to invest in homes; these borrowers expected to receive rental income and to profit from then-appreciating property values. Calhoun often enticed these borrowers into investing by telling them his congregation members were trying to become first-time homeowners. At certain times, Calhoun made clear that the borrowers would be purchasing the homes and represented that these homes would be rented to his congregation members, who would eventually purchase the houses themselves (though most often these

representations proved entirely untrue). At least one other time, Calhoun told the borrower he was seeking to form a group of people to "hold" various homes for 30 to 45 days, pending the banks' decisions to accept his congregation members and to approve them for loans. In this case, the borrower was seriously misled, and allegedly did not understand that he would in fact be purchasing the home himself or that a mortgage would be taken out in his name. Calhoun told this borrower he did not need to put any money at all into the investment because Calhoun's congregation members would be making the monthly payments; Calhoun then paid the downpayments on the mortgages himself, apparently without involving the borrower. Calhoun additionally told this borrower he would receive a return on his investment at the time the bank and his congregation members closed on the loans, simply for "holding" the properties.[5]

After lining up borrowers, Calhoun committed several fraudulent acts to obtain the mortgage loans on these properties, including misrepresenting the creditworthiness of borrowers,[6] falsifying the intended use of the properties—certifying they would be the borrowers' primary residence, rather than rental properties—certifying forged signatures as authentic, and misleading lenders as to the source of downpayments. Additionally, after a borrower invested in a house or two, Calhoun would sometimes use that borrower's credit and personal information to invest in additional homes without even consulting the borrower about this additional investment. Calhoun further

---

[5] This return was to be similar to a real estate agent's fee at closing, i.e., a reward the borrower would receive for holding the property for the ultimate buyer.

[6] For example, Calhoun would, at times, increase the gross monthly income of borrowers on loan applications and submit false supporting documents, such as bank statements.

arranged with the sellers to purchase properties at one price, and later, when seeking financing for the purchases, indicated higher sales prices.

The Kennedys assisted in this fraud in numerous ways. For example, they certified signatures on multiple affidavits stating the same borrower would primarily reside at different addresses, despite that these affidavits came before them in quick succession. They further permitted Calhoun to conduct "travel closings," by which Calhoun would pick up closing documents from LCTS and have them signed outside the presence of either Kennedy; when Calhoun returned the documents to LCTS, one of the Kennedys would nonetheless notarize the documents. An LCTS employee expressed concern over these practices, but the Kennedys ignored her warning.

Once the mortgages were obtained, the lenders wired closing funds to LCTS. Keith Kennedy would then authorize disbursements pursuant to payments claimed in the fraudulent HUD-1 settlement statements. In order to funnel some of the illicit funds back to himself in an ostensibly legitimate manner, Calhoun incorporated and owned several fake companies.[7] Although these were shell companies that performed no services, these companies would claim various expenses in the HUD-1 settlement statements. The Kennedys authorized disbursements to these shell companies without looking to the title abstract to identify that the loans were indeed made and recorded, in contravention of typical and proper settlement agent practice. Furthermore, they allowed money to be "pulled out" of the mortgage loan proceeds; this money purportedly went to shell companies, but testimony indicated the Kennedys were aware the money actually went to a defendant not involved in this appeal.

---

[7] Calhoun incorporated Fast Start Mortgage, Inc. and Silver Cross Financial Group, LLC, and owned M & C Investments, LLC. Willie Jones, a defendant who pled guilty and is not involved in this appeal, also incorporated a fake construction company, Metro One Investments, LLC.

No. 11-60431

After the Kennedys made the proper disbursements, they made additional disbursements to the shell corporations to satisfy fraudulently asserted liens. It was these funds that Calhoun was able to channel to himself. He would then use part of the disbursements to obtain future fraudulent mortgages and to reward borrowers and encourage them to borrow again. Additionally, rather than use money belonging to the actual borrower to fund the downpayments on new mortgages, Calhoun used the proceeds he illicitly obtained from earlier mortgage loans to make the downpayments himself.

Following a jury trial, the defendants were convicted of conspiracy to commit mail and wire fraud, substantive wire fraud, conspiracy to commit money laundering, and promotional money laundering for operating this scheme from 2004 to 2006. The district court sentenced Calhoun to 200 months imprisonment[8] and ordered him to pay a $3,200 special assessment. The court sentenced Keith Kennedy to 72 months imprisonment[9] and Larry Kennedy to 60 months imprisonment;[10] each of their sentences is to be followed by three years of supervised release. Each Kennedy was also ordered to pay a $3,300 special assessment. Finally, the district court ordered each defendants to pay a $10,244,574 forfeiture.

## II.

The defendants raise several issues on appeal. The issue deserving of the most attention is their assertion that the money laundering crimes merged with

---

[8] The district court sentenced Calhoun to 200 months imprisonment for each of Counts 1-4, 6-20, and 23-34, and 120 months imprisonment as to Count 38, to run concurrently.

[9] Keith Kennedy was sentenced to 72 months for each of Counts 1-21 and 23-34, to run concurrently.

[10] Larry Kennedy was sentenced to 60 months for each of Counts 1-21 and 23-34, to run concurrently.

the wire fraud crimes.  Accordingly, we turn to this issue first, before briefly addressing the defendants' remaining claims.

The defendants begin their argument by asserting that their money laundering convictions should be overturned because the allegedly laundered funds were in fact the same funds constituting the basis of the wire fraud conviction—not funds that were "profits" derived from the underlying wire fraud. Thus the money laundering counts merged with, i.e., effectively duplicated, the underlying wire fraud counts as a single crime.  Furthermore, and stated in an alternate manner, the argument is that the wire fraud crime was not complete at the time the conduct that is charged as money laundering occurred, and using that intervening conduct as a basis for money laundering resulted in a merger of the crimes.  We review *de novo* the denial of a motion to dismiss an indictment.  *United States v. Villanueva-Diaz*, 634 F.3d 844, 848 (5th Cir. 2011). To the extent this claim is premised upon a sufficiency of the evidence question, we similarly conduct *de novo* review, considering the evidence in the light most favorable to the verdict.  *United States v. Harris*, 666 F.3d 905, 907 (5th Cir. 2012).

## A.

In its statutory basics, money laundering occurs when a person, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity[.]"  18 U.S.C. § 1956(a)(1)(A)(i).  The concept of merger is implicated when a defendant is convicted under two criminal statutes for what is actually a single crime; that is, convicted under the money laundering statute for essentially the same conduct that constitutes the conduct of the "unlawful activity" upon which the money laundering count is premised—here, wire fraud.  *See United States v.*

No. 11-60431

*Lineberry*, 702 F.3d 210, 215 (5th Cir. 2012) (citing *Garland v. Roy*, 615 F.3d 391, 402 (5th Cir. 2010)). In this sense, i.e., in convicting a defendant more than once for the exact same conduct, merger is comparable to double jeopardy. *United States v. Santos*, 553 U.S. 507, 527 (2008) (Stevens, J., concurring).

The Supreme Court first addressed the possible "merger problem," and the related issue of defining the term "proceeds" under the federal money laundering statute, in *United States v. Santos*, 553 U.S. 507. Santos was convicted of, *inter alia*, running an illegal gambling business[11] and money laundering.[12] 553 U.S. at 509-10. His money laundering convictions were based upon payments he made to lottery winners and to his various employees—essentially, business expenses of conducting his illegal scheme. *Id.* at 509, 524. Santos appealed his money laundering convictions, arguing that "proceeds," as used in the money laundering statute, referred only to subsequent transactions financed by profits derived from his illegal gambling crimes; that "proceeds" did not refer to the gross receipts from his operation. *Id.* at 509-10. The argument was that gross receipts were funds from which the costs of the illegal activity scheme itself must be paid; only the proceeds from profits of the illegal venture—a fractional part of gross receipts—can be used for "investment" in a further financial transaction.

At the time the Supreme Court decided *Santos*, "proceeds" was not a defined term.[13] In endeavoring to define it, Justice Scalia, writing the plurality opinion, identified what is now known as the "merger problem," which he described as follows:

---

[11] 18 U.S.C. § 371.

[12] 18 U.S.C. § 1956(a)(1)(A)(i).

[13] In May 2009, after the transactions at issue here occurred, Congress amended the money-laundering statute to define "proceeds" as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." 18 U.S.C. § 1956(c)(9).

> If "proceeds" meant "receipts," nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery. Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, 18 U.S.C. § 1955, would "merge" with the money-laundering statute. Congress evidently decided that lottery operators ordinarily deserve up to 5 years of imprisonment, § 1955(a), but as a result of merger they would face an additional 20 years, § 1956(a)(1). Prosecutors, of course, would acquire the discretion to charge the lesser lottery offense, the greater money-laundering offense, or both—which would predictably be used to induce a plea bargain to the lesser charge.

*Id.* at 515-16. Similarly, Justice Stevens noted that "[a]llowing the Government to treat the mere payment of the expense of operating an illegal gambling business as a separate offense is in practical effect tantamount to double jeopardy." 553 U.S. at 527 (Stevens, J., concurring).[14] Because there was no evidence that the funds alleged in the money laundering counts were profits from his illegal gambling, the Court affirmed the Seventh Circuit's judgment vacating Santos's money laundering convictions.

In the years since *Santos* was decided, this Court has had a few opportunities to discuss its difficult application. *See, e.g.*, *United States v. Brown*, 553 F.3d 768, 782-83 (5th Cir. 2008) ("The precedential value of *Santos* is unclear outside of the narrow factual setting of that case, and the decision raises as many issues as it resolves for the lower courts."). In *United States v. Brown*, for example, the defendants argued that their money laundering convictions merged with their convictions for conspiracy to unlawfully distribute controlled substances and for actual distribution, because the government's

---

[14] This Court has since held, in accord with the *Santos* plurality's acknowledgment, that Justice Stevens' concurring opinion in that case, which decided the issue on the narrowest grounds and advocated a bifurcated analysis for defining proceeds, is controlling. *Garland v. Roy*, 615 F.3d 391, 399 (5th Cir. 2010).

evidence of "proceeds" was inadequate. *Id.* at 775-76, 782-85. This Court, without deciding the "thorny issue[]" of how to define proceeds, rejected this argument, finding the defendants failed even under the more stringent "profits" definition; the government introduced "ample, unchallenged evidence that the [drug] sales were profitable," and the court accordingly found that "the money laundering here at issue does not involve 'mere payment'; rather, it clearly involves payments for more drugs made out of accounts well-padded with the profits from the appellants' criminal enterprises." *Id.* at 784-85.

Later, in *Garland v. Roy*, this Court addressed the defendant's argument that he was convicted for multiple nonexistent money laundering offenses, as the Government did not prove he used "profits" to pay "returns" to investors in his illegal pyramid scheme; thus, he argued, his money laundering convictions merged with his mail fraud and securities fraud convictions. 615 F.3d 391, 393 (5th Cir. 2010). In analyzing this argument, this Court noted that a merger occurs "when a defendant could be punished for the same 'transaction' under the money-laundering statute as well as under another statute, namely the statute criminalizing the 'specified unlawful activity' underlying the money-laundering charge." *Id.* at 402; *see also Lineberry*, 702 F.3d at 215 (citing the same). The court went on to hold

> in light of the statute, indictment, and jury instructions in this case, it appears that (1) the Government did not prove or attempt to show that [the defendant] engaged in money laundering with "proceeds," narrowly defined as "profits" rather than as "gross receipts"; (2) the same "transaction may have been used to prove both the underlying unlawful activity and the money-laundering charges; and therefore (3) [the defendant's] convictions for mail and securities fraud potentially "merged," as defined by Justice Stevens and the plurality, with his money-laundering conviction.

*Garland*, 615 F.3d at 404.

No. 11-60431

Accordingly, to address merger in the money laundering context, we ask whether the money laundering crime is based upon the same or continuing conduct of the underlying predicate crime, or whether the crimes are separate and based upon separate conduct. Under this reasoning, merger may be proved in two ways: (1) a defendant may demonstrate the underlying unlawful activity was not complete at the time the alleged money laundering occurred; or (2) a defendant may show the transaction upon which the money laundering count is based was not a payment from profits of the underlying crime made in support of new crimes, but, instead, was a payment from gross receipts of the previously committed crime made to cover the costs of that same crime. *See United States v. Harris*, 666 F.3d 905, 910 (5th Cir. 2012) ("Money does not become proceeds of illegal activity until the unlawful activity is complete."); *Brown*, 553 F.3d at 785.

**B.**

We now turn to the case before us, focusing on the factual questions of whether the wire fraud was complete when the money laundering occurred, and whether the transactions for which the defendants were convicted of money laundering indeed involved profits of the underlying wire fraud.[15]

At the outset of analyzing the defendants' arguments, it is important to clarify the Government's theory of the case, that is, the theory upon which the jury found the defendants guilty. In this connection, the defendants argue that the Government presented the defendants' conduct as one, singular scheme—not one scheme of wire fraud and a separate scheme of money laundering. This statement is broadly true, but not with the consequences that the defendants

---

[15] Because the district court, "out of caution," defined proceeds as profits in its jury instructions, and because we find the defendants' arguments fail even under this more exacting definition, we need not engage in Justice Stevens' bifurcated analysis to discern the proper definition of proceeds.

No. 11-60431

urge. The very nature of the promotional money laundering statute suggests there will always be one overarching scheme,[16] but not necessarily only one crime; the question is whether within the "single scheme" to which the defendants refer, there is more than one fully completed crime.

With respect to the issue of completion of the underlying crime, the indictment clearly states that the underlying wire fraud was consummated before the defendants conducted the transactions constituting money laundering. The indictment bases the wire fraud charges specifically upon the use of wire communications to transfer the mortgage loan funds from the lenders to LCTS. Once such a transfer occurred, the Government argues, the wire fraud crime was fully consummated. *See Harris*, 666 F.3d at 910. The indictment, after charging that the wire fraud crime was complete when the lenders transferred the loan funds to LCTS, then proceeds further to charge the defendants with money laundering for subsequent transactions—transactions which transferred some of the proceeds of the mortgage loan funds to the defendants' various shell corporations.

---

[16] In relevant part, the statute states:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
>> (A)(i) with the intent to promote the carrying on of specified unlawful activity;
>> . . .
> [is guilty of money laundering.]  For purposes of this paragraph, a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.

18 U.S.C. § 1956(a)(1)(A)(i).  Accordingly, promotional money laundering inherently requires one comprehensive scheme for committing both the underlying unlawful activity and the money laundering in promotion thereof.

11

No. 11-60431

The defendants contest the indictment's characterization of the facts, arguing the wire fraud crime was incomplete at the time the mortgage loans were transferred to LCTS because the subsequent payments by LCTS to Calhoun "were transactions that normally occurred during the course of the alleged mail / wire fraud crimes." This argument is unpersuasive. Unlike payments made to lottery winners as part of the expense of engaging in the illegal gambling scheme, the payments the defendants made to shell corporations were not an ordinarily occurring aspect of the crime of wire fraud. Wire fraud is a consummated crime when the illicitly obtained funds are transmitted—in this case, when the lenders wired LCTS the mortgage loan funds.[17] If the entire scheme had come to a halt upon the Kennedys' receipt of the funds, the defendants would still have been guilty of the crime of wire fraud—which illustrates that the subsequent disbursements to the shell corporations have no bearing on the completion of the crime of wire fraud.[18]

---

[17] The federal wire fraud statute makes it a crime to wire, or cause to be wired, money with the intent to obtain that money by fraud:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate commerce, any writing, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343. Accordingly, wire fraud is consummated when the illicitly obtained funds are transmitted—in this case, when the lenders wired LCTS the mortgage loan funds.

[18] Additionally, it is simply not the case that, as the defendants contend, they were convicted for precisely the same transactions under both the wire fraud and the money laundering counts. Larry Kennedy, for example, asserts Counts 11 and 24 are duplicative. This assertion is incorrect. Count 11 charges wire fraud for a transfer of $393,147.60 from the lender to the LCTS bank account, while Count 24 charges money laundering for a transfer of $58,194.00 from the LCTS bank account to a shell corporation. As we have noted, the Government separately charged the defendants with violating the wire fraud statute for causing lenders to make mortgage loan disbursements to LCTS, and only thereafter with violating the money laundering statute by transferring part of the proceeds of the loan disbursements to shell corporations in order to promote new fraudulent loans. *See Harris*, 666 F.3d at 910 ("The crime of money laundering is targeted at the activities that generally follow

No. 11-60431

These disbursements constituted different conduct underlying a different crime. Thus in this sense, the crime of money laundering does not merge with the underlying crime of wire fraud.

We turn now to the argument that the two criminal statutes merged because the proceeds upon which the money laundering counts were based were not profits from the wire fraud, but instead, were gross receipts of the wire fraud scheme used only to pay business expenses incurred in executing the earlier crimes of wire fraud. After close review, we find this case does not present facts in which the money laundering transactions were "mere payment" of an expense of carrying on the wire fraud crime. *Santos*, 553 U.S. at 527 (Stevens, J., concurring). In the first place, the transactions that are charged as money laundering only involve the transfers of money from LCTS to the shell corporations to satisfy the fraudulent liens Calhoun had conjured up. Accordingly, there were virtually no expenses related to the money transferred, and this money constitutes profits, and profits only. As in *United States v. Brown*, "the money laundering [transactions] at issue d[id] not involve 'mere payment'; rather, [they] clearly involve[d] payments for *more*" fraudulent mortgage loan transactions "made out of accounts well-padded with the profits from the appellants' criminal enterprises." 553 F.3d at 785 (emphasis added). Moreover, the Government demonstrated that Calhoun used funds from the loan closing disbursements, made to the shell companies, to make downpayments on newly acquired mortgages and to make bonus payments to borrowers to encourage them to invest again.[19] The Government further showed that the shell companies incurred no expenses and performed no services in implementing the earlier wire fraud crimes. Thus, the defendants cannot

the unlawful act in time.").

[19] The Government presented evidence that many investors did, in fact, invest more than once.

13

plausibly argue that the disbursements made to these companies were for previously incurred expenses—indeed, they could not be anything but profits.

In sum, the crimes of wire fraud were complete before the conduct underlying the money laundering counts began; furthermore, the defendants used only profits from the underlying wire fraud crimes to assist them in committing new crimes of wire fraud. There has been no showing of merger of crimes in these convictions.

## III.

We now turn to other arguments raised by the appellants and find no merit in any of them. For all the reasons identified above, and given that our "standard of review for a challenge to sufficiency of the evidence is highly deferential to the verdict," there was sufficient evidence for the jury to find each defendant guilty on the counts for which he was convicted. *United States v. Redd*, 355 F.3d 866, 872 (5th Cir. 2003).

## A.

The Kennedys' argument that the district court erred in instructing the jury that "knowingly" includes deliberate ignorance is similarly unavailing. "We review the trial court's decision to issue a deliberate ignorance instruction for abuse of discretion." *United States v. Miller*, 588 F.3d 897, 905 (5th Cir. 2009). "We have consistently held the deliberate ignorance instruction is proper when supported by sufficient evidence, including when used with many of the crimes of which the Defendants are convicted."[20] *United States v. Scott*, 159 F.3d 916, 924 (5th Cir. 1998) (defendants were convicted of, *inter alia*, conspiracy, wire

---

[20] *See, e.g.*, *United States v. Gray*, 105 F.3d 956 (5th Cir.1997) (mail fraud, conspiracy);*United States v. McKinney*, 53 F.3d 664 (5th Cir.1995) (conspiracy); *United States v. Cavin*, 39 F.3d 1299 (5th Cir.1994) (conspiracy); *United States v. Faulkner*, 17 F.3d 745 (5th Cir.1994) (conspiracy, wire fraud, and RICO charges); *see also United States v. Wisenbaker*, 14 F.3d 1022 (5th Cir.1994) (tax evasion); *United States v. Breque*, 964 F.2d 381 (5th Cir.1992) (conspiracy); *United States v. Fuller*, 974 F.2d 1474 (5th Cir.1992) (conspiracy, money laundering).

No. 11-60431

fraud, and money laundering). In this case, the Kennedys' defense was to deny any knowledge of the fraudulent scheme. As we have discussed, there was ample evidence supporting a deliberate ignorance instruction. On numerous occasions, the Kennedys notarized documents signed outside their presence; they further notarized statements that the same borrower would primarily reside at numerous addresses, despite that these documents came before the Kennedys in quick succession; the Kennedys were on notice of the potential problems associated with these practices, as an employee alerted them to concerns she had with these practices; they disbursed funds on liens claimed in HUD-1 statements without verifying the existence of these liens; and they allowed funds to be "pulled out" of mortgage loans proceeds. *See United States v. Nguyen*, 493 F.3d 613, 622 (5th Cir. 2007) ("The sheer intensity and repetition in the pattern of suspicious activity coupled with the [defendants'] consistent failure to conduct further inquiry to create a reasonable inference of purposeful contrivance that satisfies" the requirements for a deliberate ignorance instruction.). Accordingly, the Kennedys have failed to show that the district court erred in instructing the jury on deliberate ignorance.

## B.

Nor did the district court err in denying the defendants' *Batson* challenge. We review *Batson* rulings for clear error. *United States v. Davis*, 393 F.3d 540, 544 (5th Cir. 2004). The district court found a *prima facie* showing of racial bias deriving from the prosecution's striking of two black venire members, a car-washer and an assembly line worker, when the prosecution failed to strike two white venire members, a warehouse manager who completed a year of junior college and a landscaper. The district court, however, then accepted the prosecution's race neutral explanation for these decisions, that is, that the prosecution was seeking to compose a jury with a higher level of education and sophistication for this complex case. The district court had the advantage of

15

No. 11-60431

actually being present to observe the prosecuting attorney as well as the venire members.  Certainly, we cannot say this decision was clear error.  *Id.* ("[W]e must give great deference to the district court because 'findings in this context largely turn on an evaluation of the credibility or demeanor of the attorney who exercises the [peremptory] challenge.'" (quoting *United States v. Bentley-Smith*, 2 F.3d 1368, 1373 (5th Cir. 1993) (second alteration in original))).

## C.

The defendants further challenge the district court's denial of their motions, respectively, for mistrial based upon improper outside influence on the jury and for severance.  We review each of these rulings for abuse of discretion. *United States v. Smith*, 354 F.3d 390, 394 (5th Cir. 2003) ("We review only for abuse of discretion a court's handling of complaints of outside influence on the jury."); *United States v. Solis*, 299 F.3d 420, 440 (5th Cir. 2002) (denial of motion to sever is reviewed for abuse of discretion).  After Calhoun's improper interactions with jurors outside of the courtroom, the district court judge spoke to each juror, and each stated his or her ability fairly and impartially to evaluate the case was unaffected.  Accordingly, the district court adequately handled the problem and acted within its discretion to deny the defendants' motion for mistrial.

Regarding their motions to sever, the Kennedys contend the district court should have severed their trials because Calhoun primarily orchestrated and perpetrated the scheme and the Kennedys' roles were comparatively unassuming.  To demonstrate abuse of discretion in denying severance, "the defendant bears the burden of showing specific and compelling prejudice that resulted in an unfair trial, and such prejudice must be of a type against which the trial court was unable to afford protection." *United States v. Mitchell*, 484 F.3d 762, 775 (5th Cir. 2007) (quoting *United States v. Morrow*, 177 F.3d 272, 290 (5th Cir. 1999)).  The Kennedys have not satisfactorily made such a showing.

16

No. 11-60431

The district court, as is typically appropriate, instructed the jury to "give separate consideration to the evidence as to each defendant." *See United States v. Whitfield*, 590 F.3d 325, 355-56 (5th Cir. 2009) ("Limiting instructions such as these are generally 'sufficient to prevent the threat of prejudice resulting from unsevered trials.'" (quoting *United States v. Massey*, 827 F.2d 995, 1005 (5th Cir. 1987))).    Thus, the district court did not abuse its discretion in denying severance.

**D.**

Finally, Calhoun raises two sentencing issues.  He argues that the district court erred in applying, respectively, a two-level increase to his base offense level for misrepresenting that he acted on behalf of a religious organization, and a two-level increase for abusing a position of trust.  For sentencing purposes, "[w]e review the district court's findings of fact for clear error and its interpretation and application of the [Sentencing] Guidelines *de novo*."  *United States v. Gharbi*, 510 F.3d 550, 554 (5th Cir. 2007).  The district court explicitly found "Calhoun represented himself as acting to obtain a benefit on behalf of his congregation, which is a religious organization, and that he intended to divert hidden proceeds to himself through the third-party payouts."  This finding was not clear error and, to be sure, the district court's application of a sentencing enhancement on this premise was valid.

The district court further found Calhoun abused a position of trust and accordingly enhanced his sentence, relying upon *United States v. Wright*, 496 F.3d 371 (5th Cir. 2007).  In *Wright*, this Court affirmed the district court's sentence enhancement when a mortgage broker used his position to submit false information on loan applications to lenders with whom he had preexisting relationships.  *Id.* at 375-77.  Similarly here, the district court found Calhoun was uniquely positioned to prevent fraud, but went to great lengths to conceal his fraudulent activities from lenders with whom he had repeated interactions.

No. 11-60431

Accordingly, the district court's decision to enhance Calhoun's sentence on this basis was not error.

## IV.

In this opinion, we have held that the district court correctly found the wire fraud and money laundering convictions did not merge. The wire fraud crimes were complete before the conduct forming the basis of the money laundering convictions began, and the defendants used only profits from the underlying wire fraud to promote further wire fraud crimes. Finally, the defendants have failed to identify any other reversible error. Thus, the judgment of the district court is, in all respects,

AFFIRMED.