# United States Court of Appeals for the Fifth Circuit

No. 18-30684

United States Court of Appeals
Fifth Circuit

**FILED**

October 20, 2020

Lyle W. Cayce
Clerk

Roberto Beras,

*Petitioner—Appellant*,

*versus*

Calvin Johnson, *Warden*, Oakdale Federal Correctional Institution,

*Respondent—Appellee*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 2:17-CV-276

Before Wiener, Engelhardt, and Oldham, *Circuit Judges*.

Per Curiam:

Roberto Beras is a federal prisoner. He sought postconviction review of his conviction for money laundering. But he did not do it the normal way—through a motion under 28 U.S.C. § 2255. Instead, Beras filed a § 2241 petition for habeas corpus, relying on our precedent in *Reyes-Requena v. United States*, 243 F.3d 893 (5th Cir. 2001). We hold the petition is an abuse of the writ.

No. 18-30684

## I.

## A.

Roberto Beras was the co-owner and vice president of Dinero Express, Inc., which specialized in international money transfers. *United States v. Dinero Exp., Inc.*, 313 F.3d 803, 805 (2d Cir. 2002) ("*Dinero I*"). The Government filed an eighty-two-count indictment, alleging that Beras used Dinero to facilitate "an extensive international money laundering scheme" involving New York-area drug traffickers and "the proceeds of illegal narcotics sales." *Id.* As relevant here, the Government charged Beras in Counts 3 through 35 with money laundering under 18 U.S.C. § 1956(a)(2)(B)(i) and in Count 1 with conspiracy to commit money laundering.

Section 1956(a)(2)(B)(i) makes it illegal for anyone to "transport[], transmit[], or transfer[] . . . funds from a place in the United States to or through a place outside the United States" when the individual knows those funds "represent the proceeds of some form of unlawful activity" and also knows that the transfer is "designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control" of those proceeds. 18 U.S.C. § 1956(a)(2)(B)(i).

One of Beras's main laundering practices "involved the transfer of drug proceeds to the Dominican Republic under the guise of phony money remittances through a four-step process." *Dinero I*, 313 F.3d at 805. "First, drug traffickers delivered their cash to Dinero's New York headquarters for gradual deposit into the company's bank accounts in the United States." *Id.* The money would arrive in "bulk" in the form of "big bag[s] full of cash" in amounts ranging from $20,000 to $1,000,000. Sometimes the drug traffickers would drop it off in a locked back room at a Dinero office. Or they would meet Beras at an off-site garage with their car and a "trunk full of

2

No. 18-30684

cash." The money couldn't always be deposited right away—the drop-offs were after hours—so the cash would be counted and then placed in the safe or stored above the office ceiling.

The cash was not always clean. One time, Dinero received $500,000 in cash in Miami. But it "smell[ed] like gasoline." Dinero employees then took the cash on a bus with them to New Jersey, where they *literally* laundered the money by "run[ning] it through the washing machine." The cash still stunk, but a bank accepted the deposit nonetheless. So in both literal and figurative money laundering,[1] Beras proved quite successful.

Second, after depositing the cash, "Dinero remittance invoices were generated for fictitious transactions to the Dominican Republic; the invoices used false identities and addresses and were made out in amounts small enough to avoid currency reporting requirements." *Dinero I*, 313 F.3d at 805. Delia Cruz, a former Dinero employee, testified about the scheme. She would receive instructions to file fake remittances and incorporate them into Dinero's reports. And in order to make these fake remittances "seem real" she would even "put messages into the fake remittances" as though they

---

[1] The practice of money laundering is ancient. Yet the term itself seems to have first come into use in the twentieth century. Some say the term stems from Al Capone and Prohibition. In addition to his more infamous illicit activities, Capone ran a number of laundromats. As the story goes, Capone would try to hide the source of his ill-gotten gains by mixing the cash from his illegal businesses with the cash he earned from those laundromats. By so *laundering* his dirty money, Capone sought to hide its source. Research Handbook on Money Laundering 3 (Brigitte Unger & Daan van der Linde eds., 2013); Brian O'Connell, *What Is Money Laundering and What Is Its History?*, The Street (Mar. 20, 2019). Others suggest the term stems from a more prosaic, though now obscure, activity. In the early twentieth century, many more people than today used coins—for taxis, tips, and the like. At the time, many people also wore white gloves. To avoid dirty coins leaving stains on white gloves, some places, like casinos and fine hotels, offered a service to clean coins. Thus, dirty money was laundered clean. Research Handbook on Money Laundering, *supra*, at 3.

were going to individuals *other* than drug traffickers. As another former Dinero employee said, they tried to "be creative" so it "would look like all the people listed as senders . . . ha[d] actually come into the branch and requested that money to be sent." But while the remittance amount for the usual Dinero customer was "around $300," these remittances were just "under $10,000."

"Third, arrangements were made for a Dominican 'peso supplier' to advance local currency. . . to Dinero's Dominican office, which in turn forwarded the cash to the drug traffickers' Dominican personnel under the pretense of fulfilling the fictitious remittances generated in New York." *Dinero I*, 313 F.3d at 805. These peso advances were in the same amount as the drug trafficker's original deposits, minus, of course, Dinero's five-percent commission. *Id.* Beras was in contact "on a daily basis" with the peso supplier in order to arrange these advances.

The fourth and last step involved "a wire transfer of funds from Dinero's New York operating account to the peso supplier's bank accounts in the United States." *Dinero I*, 313 F.3d at 805. By doing so, Dinero paid back the Dominican peso supplier for their advances and completed the process of secretive deposits, false remittances, peso advances, and wire transfers. Beras's scheme "enabled drug traffickers to move money located in New York to the Dominican Republic." *Id.* at 807.[2]

---

[2] The fraudulent remittances were not the only means by which Beras moved drug money between the United States and the Dominican Republic. He used "a number of different techniques." *United States v. Dinero Exp., Inc.*, 57 F. App'x 456, 458 (2d Cir. 2002) ("*Dinero II*") (per curiam). One technique involved aluminum cans and suitcases. Beras and others would fill aluminum cans with cash. The cans would be "seal[ed]"and a fake label put on. Then, Beras and others would take these cans of cash in suitcases "aboard airlines" to destinations abroad. *Id.* at 458.

The jury convicted "Beras on all eighty-two counts in the indictment. Beras was sentenced to 292 months' imprisonment, three years' supervised release, and a $4,100 mandatory special assessment, and was additionally subjected to an order of forfeiture in the amount of $10 million." *Dinero I*, 313 F.3d at 805.

## B.

Beras challenged his conviction. Because Beras's previous challenges are relevant to his abuse of the writ in this proceeding, we recount the procedural history in some detail.

Beras appealed his conviction to the Second Circuit. It affirmed in two separate opinions, *Dinero I* and *Dinero II*, issued one day apart. The Supreme Court denied review on February 23, 2004. *Beras v. United States*, 540 U.S. 1184 (2004) (mem.).

While his direct appeal remained pending, Beras filed motions in the trial court under Federal Rule of Criminal Procedure 12(b) for a new trial and Rule 33 to dismiss the indictment. The district court denied both motions; the Second Circuit affirmed each denial. *United States v. Beras*, No. 99-CR-75, 2004 WL 1418022, at *2 (S.D.N.Y. June 23, 2004), *aff'd*, 131 F. App'x 313 (2d Cir. 2005); *United States v. Beras*, No. 99-CR-75, 2005 WL 82037, at *4 (S.D.N.Y. Jan. 13, 2005), *aff'd*, 152 F. App'x 50 (2d Cir. 2005). And again the Supreme Court denied review. *Beras v. United States*, 549 U.S. 936 (2006) (mem); *Beras v. United States*, 546 U.S. 1220 (2006) (mem).

Meanwhile, Beras filed a timely 104-page § 2255 motion in the Southern District of New York on February 17, 2005. *See Beras v. United States*, No. 99-CR-75, 2013 WL 1155415, at *4-5 (S.D.N.Y. Mar. 20, 2013). That motion remained pending for eight years, during which time Beras filed numerous supplemental motions seeking to add or clarify arguments in his § 2255 motion. Among them, Beras claimed that his "sentence must be

vacated" under the Supreme Court's then-recent decision in *Cuellar v. United States*, 553 U.S. 550 (2008). But the district court held Beras's motion was untimely because his *Cuellar* argument did not "relate back to any of the grounds alleged" in his original § 2255 filing. *Id.* at *9; FED. R. CIV. P. 15(c)(1)(B); *see also Mayle v. Felix*, 545 U.S. 644, 664 (2005) (describing the interplay between § 2255 and then Rule 15(c)(2)). The district court denied the rest of the claims in Beras's § 2255 motion and subsequently denied Beras's motion for relief from judgment. *Beras v. United States*, No. 5-CV-2678, 2013 WL 2420748, at *4 (S.D.N.Y. June 4, 2013).

The Second Circuit denied Beras a certificate of appealability because, as relevant to his *Cuellar* claim, he failed to show "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Beras v. United States*, No. 13-1800 (2d Cir. Jan. 8, 2014) (citing *Slack v. McDaniel*, 529 U.S. 473, 478 (2000)).

Beras sought to raise his *Cuellar* claim again, this time in a successive § 2255 motion. But the Second Circuit denied authorization to file that § 2255 motion because *Cuellar* did not announce a "new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court." *Beras v. United States*, No. 15-1324 (2d Cir. July 15, 2015) (quoting 28 U.S.C. § 2255(h)(2)). Instead, *Cuellar* was "limited to [a] question[] of statutory interpretation." *Id.* Accordingly, it denied permission to file a second or successive § 2255 motion.

The Second Circuit denied a subsequent request to file a successive § 2255 motion on different grounds in 2016. *Beras v. United States*, No. 16-2301 (2d Cir. Nov. 10, 2016). In the time since, Beras has made other filings in the Second Circuit for amendment, reconsideration, mandamus, &c. with varying degrees of success. For instance, in June 2019, the Southern District granted Beras's request for various documents from his defense counsel

about plea agreements and offers they received prior to his trial. *Beras v. United States*, No. 99-CR-75 (S.D.N.Y. June 10, 2019). Those Southern District of New York proceedings remain pending.

This is where things get interesting. Section 2255 motions must be filed in the prisoner's court of conviction, whereas habeas petitions must be filed against the prisoner's custodian. *See United States v. Hayman*, 342 U.S. 205, 210–19 (1952) (distinguishing § 2255 motions from habeas petitions). So while Beras was litigating his § 2255 proceedings in his court of conviction (in the Southern District of New York and the Second Circuit), he *also* chose to sue his custodian for habeas corpus under 28 U.S.C. § 2241.

Beras sued the warden of his federal prison in Lisbon, Ohio in the Northern District of Ohio on March 27, 2012. He challenged his conviction on the grounds that the judge presiding over his trial violated his First Amendment, Sixth Amendment and Federal Rule of Criminal Procedure 10 rights. The district court denied his petition. *Beras v. Farley*, 2012 U.S. Dist. LEXIS 92371, *1 (N.D. Ohio July 3, 2012). And the Sixth Circuit affirmed. *Beras v. Farley*, No. 12-3896 (6th Cir. Sept. 11, 2013) (citations omitted). Once again, the Supreme Court denied certiorari. *Beras v. Coakley*, 573 U.S. 953 (2014) (mem.).

Yet even while his first § 2241 application remained pending in the Sixth Circuit, Beras filed a *second* § 2241 application in the Northern District of Ohio. In this application, Beras "argue[d] he [was] actually innocent of money laundering because the Supreme Court in *Cuellar* issued a new interpretation of . . . 18 U.S.C. § 1956(a)(2)(B)(i), which ma[de] this statute inapplicable to him." *Beras v. Coakley*, 2013 WL 5507497, *4 (N.D. Ohio Oct. 2, 2013). But the district court found that Beras failed to show that "no reasonable juror" would have convicted him because even under *Cuellar* the evidence showed Beras was guilty of money laundering. *Id.* at *3-4. The

district court thus denied his § 2241 application and the Sixth Circuit affirmed. *See Beras v. Farley*, No. 13-4297 (6th Cir. June 18, 2014).

Later, Beras was transferred to the Federal Correctional Institute in Oakdale, Louisiana. Once in a new federal district, Beras filed two new § 2241 applications against his new custodian. The district court denied one; Beras appealed; we dismissed for want of prosecution. *Beras v. Johnson*, No. 18-30823 (5th Cir. Sept. 19, 2018).

In Beras's other § 2241 application, he raised the *Cuellar* argument once again. The district court dismissed his application. Beras timely appealed, and we appointed counsel to argue on his behalf. We review his § 2241 petition *de novo*. *Garland v. Roy*, 615 F.3d 391, 396 (5th Cir. 2010).[3]

## II.

We start with the procedural vehicle Beras chose for this proceeding: Section 2241. One might reasonably wonder why Beras did not file under 28 U.S.C. § 2255, which is "the primary means of collateral attack on a federal sentence." *Cox v. Warden, Fed. Det. Ctr.*, 911 F.2d 1111, 1113 (5th Cir. 1990); *see also Lenhardt v. United States*, 416 F.2d 1254, 1255 (5th Cir. 1969) (per curiam). Beras acknowledges that he cannot successfully file a § 2255 motion because he has previously filed and lost several of them. And § 2255(h) provides that a federal prisoner, like Beras, can only file a second or successive motion when it is based on either (1) "newly discovered

---

[3] Since he filed his two § 2241 applications in this circuit, the Bureau of Prisons moved Beras to Moshannon Valley Correctional Center in Philipsburg, Pennsylvania. Under Fifth Circuit precedent, this subsequent relocation does not affect our power to hear this case. *See Griffin v. Ebbert*, 751 F.3d 288, 290 (5th Cir. 2014) ("Jurisdiction attached on that initial filing for habeas corpus relief, and it was not destroyed by the transfer of petitioner and accompanying custodial change."). Beras filed a subsequent § 2241 application in the Western District of Pennsylvania on June 30, 2017.

No. 18-30684

evidence" or (2) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." 28 U.S.C. § 2255(h). Beras's *Cuellar* claim is neither.

Beras instead argues that he has statutory escape hatches in §§ 2241 and 2255(e). The latter subsection allows federal prisoners to file habeas petitions under § 2241 when § 2255 is "inadequate or ineffective." In *Reyes-Requena*, our circuit interpreted that text to allow claims based on new interpretations of federal statutes—like *Cuellar*—when three prerequisites are met. 243 F.3d at 904. First, the federal prisoner's application "raises a claim 'that is based on a retroactively applicable Supreme Court decision.'" *Garland*, 615 F.3d at 394 (quoting *Reyes-Requena*, 243 F.3d at 904). Second, "the claim was previously 'foreclosed by circuit law at the time when [it] should have been raised in petitioner's trial, appeal or first § 2255 motion.'" *Id.* (alteration in original). And third, the "retroactively applicable decision establishes that 'the petitioner may have been convicted of a nonexistent offense.'" *Id.*

Beras and the Government hotly dispute whether Beras and his *Cuellar* claim meet the *Reyes-Requena* prerequisites. But we need not decide that question because Beras's § 2241 application fails on other grounds. *See Hunter v. Tamez*, 622 F.3d 427, 430 (5th Cir. 2010) ("We may affirm the district court's denial of [§ 2241] relief on any ground supported by the record."). It is an abuse of the writ of habeas corpus.

Section 2244(a) allows us to dismiss a successive habeas application. *See McClesky v. Zant*, 499 U.S. 467, 483 (1991). The Supreme Court has interpreted this statute to be consistent with the common-law "judicial evolution" of the "abuse-of-writ" principle. *Id.* at 484 (citing *Sanders v. United States*, 373 U.S. 1, 11–12 (1963)). While "abuse of the writ refers to a complex and evolving body of equitable principles informed and controlled

9

No. 18-30684

by historical usage, statutory developments, and judicial decisions," the Supreme Court has sketched out its main contours. *Id.* at 489.

In general, there are two circumstances where a § 2241 application should be dismissed as an "abuse of the writ." First, "a petitioner can abuse the writ by raising a claim in a subsequent petition that he could have raised in his first, regardless of whether the failure to raise it earlier stemmed from a deliberate choice." *Id.* Second, it is an abuse of the writ for a prisoner to raise the same claim a second time. *See Salinger v. Loisel*, 265 U.S. 224, 231 (1924) ("Among the matters which may be considered, and even given controlling weight, are . . . a prior refusal to discharge on a like application."); *accord United States v. Tubwell*, 37 F.3d 175, 177–78 (5th Cir. 1994).[4]

Both apply to Beras's § 2241 application. Beras filed a § 2241 application in the Northern District of Ohio in 2012—almost four years after *Cuellar*—but did not include a *Cuellar* claim. Moreover, Beras raised his *Cuellar* claim in his second § 2241 application to the Northern District of Ohio. As this circuit has said many times, subsequent § 2241 applications are barred "if the same legal issue . . . [is] addressed and resolved in [a] prior" application. *Tubwell*, 37 F.3d at 177–78; *see also Zuniga-Hernandez v. Chapa*, 685 F. App'x 314 (5th Cir. 2017) (per curiam); *Rich v. Tamez*, 489 F. App'x 754 (5th Cir. 2012) (per curiam); *Kinder v. Purdy*; 222 F.3d 209, 214 (5th Cir. 2000) (per curiam); *Davis v. Fechtel*, 150 F.3d 486, 490–91 (5th Cir. 1998).

---

[4] Congress slightly changed § 2244(a)'s text in AEDPA, but we have said the same abuse-of-the-writ principles continue to apply. *See, e.g.*, *Davis v. Fechtel*, 150 F.3d 486, 491 (5th Cir. 1998) ("Davis's third section 2241 petition . . . clearly constitutes an abuse of the writ either under our pre- or post-AEDPA jurisprudence."); BRIAN MEANS, POSTCONVICTION REMEDIES § 27:15 ("§ 2244(a) prohibits the filing of second or successive § 2241 petitions if the issues therein were, or could have been, decided in a prior federal habeas action.").

Beras seeks to avoid this result with two arguments. First, Beras argues that § 2244(a) does not apply to his § 2241 application because § 2244(a) includes the language "except as provided in section 2255." **Reply Br. 18–19.** But all this provision means is that the restrictions in § 2244 do not apply to § 2255 motions and vice versa. *Stanko v. Davis*, 617 F.3d 1262, 1269 (10th Cir. 2010). Rather, each provision has its own restrictions. Reinforcing that each operates in its own sphere is the fact that § 2244(a) use the term "applications," the same term for the remedy in § 2241. By contrast, § 2255 and its restrictions exclusively refer to "motions." *See In re Hanserd*, 123 F.3d 922, 930 (6th Cir. 1997). Beras concedes that the restrictions in § 2255 bar him from filing his *Cuellar* claim under that provision, so "except as provided in section 2255" provides him zero help.

Yet Beras argues that this language *does* apply to him because his claim is really a § 2255 motion in disguise, and thus there are no § 2244(a) limits. That is obviously wrong. Our circuit in *Reyes-Requena* said that it was "permit[ing]" federal prisoners to file "claim[s] under § 2241" because a § 2255 motion would be "inadequate or ineffective" for their claims. *Reyes-Requena*, 243 F.3d at 906. And the Supreme Court has made clear that if a federal prisoner has shown "an inadequate or ineffective remedy under § 2255" that prisoner would "be entitled to proceed in federal habeas corpus—where, *of course*, § 2244 applies." *Sanders*, 373 U.S. at 14–15 (emphasis added). Indeed, it would be surreal to hold that § 2244(a)'s codification of the abuse-of-the-writ doctrine does not apply to abusive, second, and successive habeas applications. We reject Beras's arguments to the contrary.

Second, Beras argues that we should not dismiss because the Sixth Circuit used an "incorrect" standard to assess his previous *Cuellar* claim. But the Supreme Court has said that "the rule against repetitive litigation" has "plenty of bite." *Banister v. Davis*, 140 S. Ct. 1698, 1707 (2020). Thus,

No. 18-30684

abuse-of-the-writ principles "demand[] the dismissal of successive applications except in 'rare case[s].'" *Id.* (quoting *Kuhlmann v. Wilson*, 477 U.S. 436, 451 (1986) (plurality op.)). Beras's case is not such a rare case. Beras has filed claims in at least four circuits and for nearly twenty years. To allow him to repeat the same claim—heard and denied by another circuit—would be to condone forum-shopping, *cf. Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004) (rejecting a rule that would allow "rampant forum shopping" by § 2241 habeas petitioners), and undermine the finality of a judgment that's otherwise protected by the abuse-of-the-writ doctrine, *see McCleskey*, 499 U.S. at 492 ("Perpetual disrespect for the finality of convictions disparages the entire criminal justice system.").

AFFIRMED.

No. 18-30684

ANDREW S. OLDHAM, *Circuit Judge*, concurring:

I join the majority opinion because it correctly applies the abuse-of-the-writ doctrine. I write separately about our decision in *United States v. Reyes-Requena*, 243 F.3d 893 (5th Cir. 2001). In that decision, our court created a contra-textual exception to the limitations Congress imposed on federal habeas corpus. That was wrong. In an appropriate case, our en banc court should overrule *Reyes-Requena* and follow the statute Congress wrote.

Lest my criticisms seem quixotic or unduly harsh, it bears emphasis that *Reyes-Requena* is our canonical statement on the meaning of 28 U.S.C. § 2255(h). That statute, in turn, applies to every single federal prisoner seeking relief in a second-or-successive postconviction motion. We owe it to those prisoners, the rule of law, the separation of powers, and the Great Writ to recognize the magnitude of our mistake.

I.

A.

It's oft-said that habeas corpus originated in Magna Carta.[1] Chapter 39 of the Great Charter declared: "No free man shall be taken or imprisoned or dispossessed, or outlawed, or banished, or in any way destroyed, nor will we go upon him, nor send upon him, except by the legal judgment of his peers or by the law of the land." GREAT CHARTER OF LIBERTIES, ch. 39 (1215), *reprinted in* SELECT DOCUMENTS OF ENGLISH CONSTITUTIONAL HISTORY 42, 47 (George Burton Adams & H. Morse Stephens eds., 1929) (1901). When King John accepted the barons' demands

---

[1] *See, e.g.*, Amanda L. Tyler, *A "Second Magna Carta": The English Habeas Corpus Act and the Statutory Origins of the Habeas Privilege*, 91 NOTRE DAME L. REV. 1949, 1957 (2016). The proposition is not without controversy. *See, e.g.*, WILLIAM J. CUDDIHY, THE FOURTH AMENDMENT: ORIGINS AND ORIGINAL MEANING 109–15 (2009) (arguing that Coke basically made this up).

at Runnymede, the people of England got their first positive law—a statute of sorts—that protected them against arbitrary imprisonment.

When the Stuarts arbitrarily imprisoned English citizens, courts attempted to check the Crown's abuses through habeas. Those efforts were often ineffective—which prompted Parliament to pass more habeas statutes. For example, a habeas case spurred the Petition of Right. *See Darnel's Case* ("*Five Knights' Case*") 3 How. St. Tr. 1, 1–59 (K.B. 1627); Frances Relf, The Petition of Right 1–19 (1917) (Ph.D. dissertation, University of Minnesota) (noting the *Five Knights' Case* was an essential predicate of the Petition). Habeas cases spurred Parliament to abolish the King's Court of High Commission. *See, e.g.*, *Burrowes v. The High Commission Court* 81 Eng. Rep. 42 (K.B. 1616); The Act for Abolition of the Court of High Commission, 17 Car. I c. 11 (1641), *in* The Constitutional Documents of the Puritan Revolution 1625–1660, at 186–89 (Samuel Rawson Gardiner ed., 3d ed. 1906); Catherine Drinker Bowen, The Lion and the Throne: The Life and Times of Sir Edward Coke 1552–1634, at 530 (1957). Habeas likewise spurred Parliament to abolish the Star Chamber. *See Lilburne's Case*, 3 How. St. Tr. 1315, 1331–49 (1637); Habeas Corpus Act of 1641, 16 Car. I c. 10 (Eng.). And further habeas abuses prompted Parliament to pass the Habeas Corpus Act of 1679. *See, e.g.*, *Earl of Clarendon Case*, 6 Cobbett's St. Tr. 317, 330–31 (Eng. 1667); 4 Parl. Hist. Eng. (1679) cols. 1148–49 (recording evolution of the Act to final form). The lattermost statute was the "stable bulwark of our liberties." 1 W. Blackstone, Commentaries *137. Indeed, Blackstone called the 1679 habeas statute the "second magna carta." *Id.* at *133. This noble history is what made habeas the "Great Writ." *See* 3 Blackstone, *supra*, at *129

(describing *habeas corpus ad subjiciendum* as "the great and efficacious writ in all manner of illegal confinement").[2]

### B.

Just as statutes framed the writ of habeas corpus in England, so too here. Our Nation's foundational habeas case—which arose from the Burr conspiracy—turned on the Supreme Court's interpretation of § 14 in the first Judiciary Act. *See Ex parte Bollman*, 8 U.S. (4 Cranch) 75 (1807). And in that case, the Court announced a seminal habeas principle: "the power to award the writ" of habeas corpus "by any of the courts of the United States, must be given by written law." *Id.* at 94.

Of course, only Congress can write law. *See id.* at 95 (noting the "privilege" of habeas corpus "would be lost" if no statutory "means be . . . in existence"). And since it's Congress's law to write, it's also Congress's law to shape. *See id.* at 94; *Felker v. Turpin*, 518 U.S. 651, 664 (1996) (noting "judgments about the proper scope of the writ are normally for Congress to make" (quotation omitted)). Therefore, Congress always has the first word;

---

[2] This of course is not to say that English courts did not play a powerful role in fashioning the writ as it existed at our Founding. *See, e.g.*, Richard H. Fallon, Jr. & Daniel J. Meltzer, *Habeas Corpus Jurisdiction, Substantive Rights, and the War on Terror*, 120 Harv. L. Rev. 2029, 2044 (2007) (arguing that judge-made habeas law was "not only historically dominant, but also, for the most part, historically successful"); Paul D. Halliday & G. Edward White, *The Suspension Clause: English Text, Imperial Contexts, and American Implications*, 94 Va. L. Rev. 575, 611 (2008) ("[T]he writ was fashioned by judges, not handed down by Parliament. A persistent misapprehension about the English history of habeas is that 'the Great Writ' was a parliamentary rather than a judicial gift."). Jurists like Edward Coke are rightly celebrated for their use of common-law writs to check royal abuses in the seventeenth century. *See, e.g.*, Bowen, *supra*, at 291–92, 295–306. It is nonetheless also true that enduring reforms came from Parliament. As Coke himself argued, the whole reason England needed the Petition of Right was that common-law habeas alone was insufficient: "The [Five Knights] hath sued for remedy in King's Bench by *habeas corpus* and hath found none. Therefore it is necessary to be cleared in Parliament." *Id.* at 488.

No. 18-30684

and in the absence of a constitutional problem, it also has the last. *See Felker*, 518 U.S. at 664.[3]

Congress has exercised its habeas power ever since the Judiciary Act of 1789. *See* Judiciary Act of 1789, ch. 20, 1 Stat. 73, 81–82; *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1974 n.20 (2020) ("[T]he scope of habeas has been tightly regulated by statute, from the Judiciary Act of 1789 to the present day . . . ."). And Congress has made many changes over the last two centuries. At first, the federal writ of habeas corpus could only test the lawfulness of federal custody. *See* Judiciary Act of 1789, 1 Stat. at 81–82. Congress expanded the writ to include certain state prisoners in the 1830s and 1840s. *See* Force Act of March 2, 1833, ch. 57, § 7, 4 Stat. 634–35; Act of August 29, 1842, ch. 257, 5 Stat. 539–40. And then Congress expanded it to all state prisoners after the Civil War. *See* Act of February 5, 1867, ch. 28, 14 Stat. 385–87 (1867).

Congress made further changes in the middle of the last century. "In 1948, as part of a general revision of the federal codes and in recognition of . . . judicially wrought changes in the scope of habeas corpus, habeas was split into three distinct statutes." NANCY J. KING & JOSEPH L. HOFFMAN, HABEAS FOR THE TWENTY-FIRST CENTURY 9–10 (2011). All three can be found in title 28 of the United States Code. Congress maintained a descendant of the original writ in § 2241. But Congress imposed limits on state prisoners in § 2254. And as most relevant to Beras, Congress imposed limits on federal prisoners in § 2255.

---

[3] In exceptional circumstances not relevant here, the Court has noted "the absence of any express statutory guidance from Congress" and then "filled the gaps of the habeas corpus statute." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993); *see, e.g., id.* at 633–38 (identifying a statutory gap and supplying a harmless-error rule); *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977) (identifying a statutory gap and supplying a procedural-default rule).

No. 18-30684

"The need for Section 2255 is best revealed by a review of the practical problems that had arisen in the administration of the federal courts' habeas corpus jurisdiction." *United States v. Hayman*, 342 U.S. 205, 210 (1952). By 1948, five districts (including those which encompassed Alcatraz and Leavenworth) accounted for most federal prisoners, and these districts "were required to handle an inordinate number of habeas corpus actions." *Id.* at 214; *see McNally v. Hill*, 293 U.S. 131, 137 (1934) (holding habeas corpus actions run only against prisoners' custodians). Moreover, these districts were "far from the scene of the facts, the homes of the witnesses[,] and the records of the sentencing court," thus making collateral review of sentences more difficult. *Ibid.* Congress responded by replacing habeas petitions with § 2255 motions. Under the then-new § 2255, prisoners could file motions "to vacate, set aside[,] or correct any sentence subject to collateral attack" in the courts in which the federal prisoner had been sentenced. *Id.* at 207. This "practical" change made § 2255 motions "as broad as [pre-1948] habeas corpus" petitions. *Id.* at 217. And the pre-1948 action—now codified at § 2241—remained available only if § 2255 proved "inadequate or ineffective." *Id.* at 223. Since it was enacted, § 2255 has been "the primary means of collaterally attacking a federal sentence" or conviction. *Tolliver v. Dobre*, 211 F.3d 876, 877 (5th Cir. 2000); *accord Lenhardt v. United States*, 416 F.2d 1254, 1255 (5th Cir. 1969) (per curiam).

The most recent overhaul of § 2255 came when Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996. AEDPA "contained a series of amendments to existing federal habeas corpus law."[4] *Felker*, 518

---

[4] Since the exception created by *Reyes-Requena* is limited to claims brought by federal prisoners, this analysis is confined to the changes Congress made to § 2255 motions. AEDPA similarly made numerous changes to claims brought by state prisoners under § 2254.

U.S. at 656. Among these amendments, Congress created "for the first time a fixed time limit for collateral attacks in federal court on a judgment of conviction." *Mayle v. Felix*, 545 U.S. 644, 654 (2005); *see* 28 U.S.C. § 2255(f). Congress also enacted gatekeeping provisions to limit the types of claims that federal prisoners could bring in "second or successive" motions. *See* 28 U.S.C. § 2255(h). These provisions limit those motions to two types of claims. A federal prisoner can bring (1) a claim based on "newly discovered evidence" or (2) a claim based on "a new rule of *constitutional* law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." *Id.* § 2255(h) (emphasis added).

That is where Congress left the "written law" of federal postconviction review. *See Bollman*, 8 U.S. at 94. In only two types of cases could federal prisoners file second or successive motions to collaterally attack their sentences. Legislative primacy—which has been a hallmark of habeas corpus since Magna Carta in 1215, the second great charter in 1679, and *Bollman* in 1807—requires us to respect the choices Congress made.

## II.

Lower federal courts had other ideas, however. Around the same time that Congress enacted AEDPA's new limits on federal claims, the lower federal courts faced a predicament: what to do about claims based on the Supreme Court's two decisions in *Bailey v. United States*, 516 U.S. 137 (1995), and *Bousley v. United States*, 523 U.S. 614 (1998). Our court's answer was *Reyes-Requena*.

In *Bailey*, the Supreme Court confronted 18 U.S.C. § 924(c)(1), which criminalized the "use" of a firearm "during and in relation to any crime of violence or drug trafficking crime." Interpreting the word "use" had "been the source of much perplexity in the [lower] courts." *Bailey*, 516 U.S. at 142. The Supreme Court resolved those "interpretational difficulties" by

No. 18-30684

providing a narrower interpretation of "use" than many of the circuits had adopted. *Id.* at 142–43, 150.

In *Bousley*, the Supreme Court decided that its *Bailey* decision would apply retroactively to federal prisoners collaterally attacking their § 924(c)(1) convictions under § 2255. 523 U.S. at 620–21. Thus, the *Bailey-Bousley* duo offered relief to thousands and thousands of defendants who had been convicted under a broader definition of "use." KING & HOFFMAN, *supra*, at 115. This in turn caused a "dramatic spike" in successive § 2255 motions. *Ibid.* Of course, Congress did not authorize successive § 2255 motions for *statutory* claims under *Bailey-Bousley*. *See* 28 U.S.C. § 2255(h)(2) (limiting "new rule" successive motions to *constitutional* claims).

That did not stop us in *Reyes-Requena*. The United States convicted Jose Evaristo Reyes-Requena under § 924(c)(1). 243 F.3d at 895. He alleged that he was legally innocent of that crime because he was convicted under a broader definition of "use" than the one adopted in *Bailey*. *Id.* at 904. Furthermore, he argued, *Bousley*'s retroactivity decision allowed him to seek relief. *Id.* at 904–05.

But Reyes-Requena had a problem: he had already challenged his conviction in a § 2255 motion. *Id.* at 895. Therefore, before we could reach either *Bailey* or *Bousley*, we had to confront AEDPA's prohibition on second or successive § 2255 motions. *See* 28 U.S.C. § 2255(h). Again, that provision bars all such motions unless the prisoner can satisfy one of two statutory exceptions. Reyes-Requena did not base his claim on new evidence, so § 2255(h)(1) was irrelevant. And Reyes-Requena did not base his claim on the Constitution—after all, *Bailey* was a *statutory* decision—so § 2255(h)(2) was irrelevant. Thus, Congress's written law plainly barred Reyes-Requena's successive claim. *See Reyes-Requena*, 243 F.3d at 903.

19

We nevertheless opened the door that Congress closed. The key was § 2255(e)—the subsection known as the "savings clause." The savings clause provides that a federal prisoner may bring claims under § 2241 *only* if a § 2255 motion proves "inadequate or ineffective to test the legality of his detention." 28 U.S.C. § 2255(e). The *Reyes-Requena* panel held that Congress made § 2255 motions "inadequate or ineffective" by failing to include a third exception in § 2255(h) for statutory claims. 243 F.3d at 904.

The court then created three prerequisites for future federal prisoners to evade the strictures of § 2255(h). A federal prisoner, otherwise barred by § 2255(h), could file a § 2241 application when:

> (1) the petition raise[d] a claim "that [wa]s based on a retroactively applicable Supreme Court decision"; (2) the claim was previously "foreclosed by circuit law at the time when it should have been raised in petitioner's trial, appeal or first § 2255 motion"; and (3) that retroactively applicable decision establishe[d] that "the petitioner may have been convicted of a nonexistent offense."

*Garland v. Roy*, 615 F.3d 391, 394 (5th Cir. 2010) (quoting *Reyes-Requena*, 243 F.3d at 904). *Reyes-Requena* suggested its statutory revision was necessary because Congress's version of § 2255(h) "likely r[a]n afoul of the Constitution." 243 F.3d at 903 n.28; *see also id.* at 901 n.19.

### III.

*Reyes-Requena* was wrong the day it was decided. And in the years since, its reasoning has been rejected by jurists around the country. *See, e.g.*, *Wright v. Spaulding*, 939 F.3d 695, 706–07 (6th Cir. 2019) (Thapar, J., concurring); *McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1097 (11th Cir. 2017) (en banc); *Samak v. Warden, FCC Coleman-Medium*, 766 F.3d 1271, 1284–86 (11th Cir. 2014) (W. Pryor, J., concurring); *Brown v. Caraway*, 719 F.3d 583, 597–600 (7th Cir. 2013) (statement of

Easterbrook, C.J.); *Prost v. Anderson*, 636 F.3d 578, 592–93 (10th Cir. 2011) (Gorsuch, J.). In line with these criticisms, it's clear that *Reyes-Requena* is neither required by the Constitution nor faithful to the text Congress enacted.

## A.

Let's start with the illusory constitutional problem. The Suspension Clause of the Constitution provides: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. CONST. art. I, § 9, cl. 2. The *Reyes-Requena* court implied that preventing second or successive claims based on new interpretations of statutes—as Congress did in § 2255(h)—"suspends" the privilege of the writ of habeas corpus. 243 F.3d at 901 n.19. Thus, the court *had to* create its exception to avoid enforcing statutory limits that violated the Suspension Clause.

That's wrong. Since the Founding, the federal courts have countenanced two types of Suspension Clause claims. The first might be called *de jure* claims, where Congress or a federal official proclaims that the privilege of the writ of habeas corpus is suspended. Thus, during the Civil War, the writ of habeas corpus was suspended by proclamation and legislation by "President Lincoln and then by Congress, and later during Reconstruction by President Grant." *Thuraissigiam*, 140 S. Ct. at 1978 (citing *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 116 (1866); *Ex parte Merryman*, 17 F. Cas. 144, 151–52 (C.C.D. Md. 1861) (No. 9487)). The government also officially suspended the writ in the Philippines in 1905 during a state of "insecurity and terrorism," *Fisher v. Baker*, 203 U.S. 174, 179–80 (1906), and in Hawaii after Pearl Harbor, *Duncan v. Kahanamoku*, 327 U.S. 304, 307 (1946). Obviously, Congress did not suspend the writ in this *de jure* sense when it limited second or successive § 2255 motions.

The other type of suspension claim is a *de facto* one. In recent times, the Supreme Court has evaluated "major legislative enactments" to determine whether they effectively suspended the privilege of habeas corpus. *Boumediene v. Bush*, 553 U.S. 723, 773 (2008). *But see Thuraissigiam*, 140 S. Ct. at 1983 (Thomas, J., concurring) (arguing that the original public meaning of "suspension" only referred to certain "statute[s] granting the executive the power to detain without bail or trial based on mere suspicion of a crime or dangerousness"). The Supreme Court has considered *de facto* suspension claims against the Military Commissions Act and Detainee Treatment Act, *Boumediene*, 553 U.S. at 723–24, 771, multiple provisions of the Illegal Immigration Reform and Immigrant Responsibility Act, *Thuraissigiam*, 140 S. Ct. at 1966; *INS v. St. Cyr*, 533 U.S. 289, 298 (2001), and of course AEDPA, *Felker*, 518 U.S. at 664; *see also St. Cyr*, 533 U.S. at 299–300.

Most relevant to the present discussion, the Supreme Court emphatically rejected *Reyes-Requena*'s central premise almost 25 years ago. In *Felker*, the Court considered whether Congress effectuated a *de facto* suspension of the writ by generally prohibiting second-or-successive habeas petitions from state prisoners. These provisions are *in pari materia* with those Congress imposed on federal prisoners in § 2255(h). *See In re Lampton*, 667 F.3d 585, 588 n.6 (5th Cir. 2012). In both sections, Congress restricted second-or-successive claims to (1) certain new factual predicates or (2) certain new rules of constitutional law. *See* 28 U.S.C. §§ 2244(b)(2), 2255(h).

The *Felker* Court held these restrictions easily survived Suspension Clause scrutiny. For decades the federal courts had "restrain[ed]" multiple filings by prisoners under the "abuse of the writ" doctrine. *Felker*, 518 U.S. at 664. This doctrine represented the accumulation of a "complex and evolving body of equitable principles informed and controlled by historical usage, statutory developments, and judicial decisions." *Ibid.* (quotation

omitted). And it was Congress's prerogative to "add[] restrictions" in AEDPA on "second habeas petitions . . . within the compass of this evolutionary process." *Ibid.* Thus, the restrictions Congress enacted in AEDPA presented no Suspension Clause problems. Indeed, it's hard to imagine how they could. A statute that allows prisoners to collaterally attack their sentence once—and sometimes two, three, or more times—is more than enough to "avoid[] any serious question about [its] constitutionality." *Swain v. Pressley*, 430 U.S. 372, 381 (1977).

And even if we could imagine a post-*Felker* Suspension Clause problem, the Supreme Court retains "its power to grant an Original Writ." *Samak*, 766 F.3d at 1291 (W. Pryor, J., concurring). Nothing in AEDPA changes that. *See Felker*, 518 U.S. at 658 ("[T]he Act . . . does not deprive this Court of jurisdiction to entertain original habeas petitions."). To that end, all federal prisoners "who allege that they have been erroneously sentenced or unfairly tried" can always seek relief in the Supreme Court. *Samak*, 766 F.3d at 1291 (W. Pryor, J., concurring). And because the Constitution allows Congress to abolish all federal courts except the Supreme one, *see* U.S. CONST. art. III § 1, cl. 1, "it makes no sense" to say Congress violates the Suspension Clause by retaining the habeas remedy in the only court the Constitution requires. *McCarthan*, 851 F.3d at 1094.

With a case so on-point from the highest court in the land, it's quite surprising that the *Reyes-Requena* court *did not even cite Felker*. It's even more surprising that our circuit would find § 2255(h)'s restrictions likely unconstitutional when the Supreme Court had held the exact same restrictions were *in fact* plainly constitutional. *See Felker*, 518 U.S. at 664. And it's no answer to say that *Felker* dealt with only state prisoners. Even though Congress enacted two separate statutory regimes for state and federal prisoners, the Supreme Court has routinely interpreted them in "lockstep."

No. 18-30684

King & Hoffman, *supra*, at 111; *see, e.g.*, *McCleskey v. Zant*, 499 U.S. 467, 484 (1991).

The Supreme Court has answered our Suspension Clause question. *Reyes-Requena* was wrong not to listen.

B.

Without a Suspension Clause sword hanging over § 2255, we must consider the statutory text as Congress wrote it. *Compare St. Cyr*, 533 U.S. at 314 (interpreting statute to avoid "adopting a construction that would raise serious [Suspension Clause] questions"), *with Thuraissigiam*, 140 S. Ct. at 1983 (interpreting the statutory text when the Suspension Clause and the Due Process Clause were not violated). A plain reading of the text shows *Reyes-Requena* was wrong.

The full text of § 2255(e) provides:

> An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, *unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.*

28 U.S.C. § 2255(e) (emphasis added). The last clause of this provision— italicized above for ease of reference—is the savings clause.

The textual key to understanding § 2255(e) is that it contrasts two different things: "relief" and "remedy." "Relief" is "[t]he redress or benefit . . . that a party asks of a court." *Relief*, Black's Law Dictionary (11th ed. 2019). For a federal prisoner filing a motion under § 2255, the relief is vacatur of his conviction or sentence. By contrast, the "remedy" is "[t]he *means* of enforcing a right or preventing or redressing a

24

wrong." *Remedy*, Black's Law Dictionary (11th ed. 2019) (emphasis added). So the § 2255 motion itself is the "remedy" (the means) a federal prisoner uses to seek "relief" (from custody).[5]

The savings clause is triggered *only* where "*the remedy* by motion is inadequate or ineffective to test the legality of [the prisoner's] detention." 28 U.S.C. § 2255(e) (emphasis added). That is, the § 2255 motion itself ("the remedy") must be inadequate or ineffective. It's often true that § 2255 is inadequate or ineffective to provide "*relief*"—that's why there are individuals in federal prisons with unvacated convictions and sentences. But that's irrelevant. The savings clause springs into action only where a federal prisoner cannot avail himself of § 2255 *at all*—that is, "the remedy by motion [under § 2255] is inadequate or ineffective to test the legality of his detention." *Ibid.*

For instance, we have held that § 2255 is an inadequate remedy to attack "the manner in which a sentence is executed." *Tolliver*, 211 F.3d at 877. This makes some sense because a § 2255 motion can only be used to attack the *validity* of a prisoner's sentence, *see* 28 U.S.C. § 2255(a), not how the Bureau of Prisons executes it. Section 2255(e) therefore allows federal prisoners to bring § 2241 petitions for the latter. Thus, we have permitted § 2241 challenges to the computation of good-time credits by prison officials, *see, e.g.*, *United States v. Cleto*, 956 F.2d 83, 84 (5th Cir. 1992) (per curiam), as well as challenges to parole decisions in the old parole system, *see, e.g.*, *Blau v. United States*, 566 F.2d 526, 528 (5th Cir. 1978) (per curiam). In these

---

[5] This dichotomy is evident elsewhere in the habeas statutes too. For example, § 2254 requires state prisoners to "exhaust[ ] the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). Thus, they must use the avenues available to test their convictions in state court before seeking to use "remedies in Federal Courts." *Id.* § 2254; *see O'Sullivan v. Boerckel*, 526 U.S. 838 (1999). If they received *relief* in state court, the state prisoners obviously would have no need to file § 2254 petitions in federal court.

circumstances, the petitioner is not challenging the validity of his sentence, but rather the execution of it.

Section 2255 is also an "inadequate or ineffective" means to challenge convictions when the prisoner's sentencing court *no longer exists*. Again, that makes sense. Section 2255 motions must be filed in the court "which imposed the sentence." 28 U.S.C. § 2255(a). But attempting to submit such a motion to a court that no longer exists would plainly be an "inadequate or ineffective" remedy. Take, for example, challenges to military convictions. *See Fletcher v. Outlaw*, 578 F.3d 274, 276 (5th Cir. 2009). Section 2241 is used for these challenges because "[g]eneral courts-martial are ad hoc proceedings which dissolve after the purpose for which they were convened has been resolved. As a result, there is not a sentencing court in which a military prisoner may bring a § 2255 motion." *Witham v. United States*, 355 F.3d 501, 505 (6th Cir. 2004).

Beyond these limited lacunas, the § 2255 remedy is generally both adequate and effective. *See, e.g.*, *Hill v. United States*, 368 U.S. 424, 427 (1962) ("[Section] 2255 was enacted . . . simply to provide in the sentencing court a remedy exactly commensurate with that which had previously been available by habeas corpus . . . ."); *Hayman*, 342 U.S. at 223 (finding that § 2255 is adequate and effective because "[n]othing has been shown to warrant" a contrary holding). The types of claims that can be brought under this remedy are extensive to put it mildly.[6]

---

[6] Federal prisoners have raised a variety of statutory and constitutional challenges in § 2255 motions. *See, e.g.*, *United States v. Carreon*, 803 F. App'x 790 (5th Cir. 2020) (per curiam) (granting § 2255 relief and vacating a kidnapping conviction under § 924(c) in light of *Davis v. United States*, 139 S. Ct. 2319 (2019)); *United States v. Young*, 809 F. App'x 203 (5th Cir. 2020) (per curiam) (granting § 2255 relief and determining that negligent conduct does not constitute a violent felony under § 924(e)); *United States v. Conley*, 349 F.3d 837 (5th Cir. 2003) (granting § 2255 relief and vacating a sentence because of ineffective

But most relevant here, *Bousley* itself proves that § 2255 is perfectly adequate and effective. After all, the prisoner in that case filed his *Bailey* claim under § 2255. *Bousley*, 523 U.S. at 616. And he did so quite effectively. The only thing that Congress demanded—in its written law—is that federal prisoners bring their *Bailey* claims in their *first* § 2255 motion as Bousley did. 28 U.S.C. § 2255(e). That restriction does nothing to make § 2255 "inadequate or ineffective" for anyone else.

## C.

*Reyes-Requena* held that the § 2255 remedy was "inadequate or ineffective" anyway. The panel's theory appeared to be that § 2255 as a whole was inadequate or ineffective because subsection (h) would bar Reyes-Requena from raising his *Bailey* claim. *See Reyes-Requena*, 243 F.3d at 906. There are at least seven problems with that.

---

assistance of counsel); *United States v. Stricklin*, 290 F.3d 748 (5th Cir. 2002) (per curiam) (same); *United States v. Silva*, 106 F.3d 397 (5th Cir. 1997) (unpublished) (same).

And although § 2255(h) generally bars second-or-successive motions—as Congress directed—federal prisoners can and sometimes do thread the needle. *See, e.g.*, *United States v. Dixon*, 799 F. App'x 308 (5th Cir. 2020) (per curiam) (authorizing successive petition based on *Davis*); *United States v. Chaney*, 820 F. App'x 290 (5th Cir. 2020) (per curiam) (noting prior authorization of successive petition based on *Johnson v. United States*, 576 U.S. 591 (2015)); *United States v. Vickers*, 967 F.3d 480 (5th Cir. 2020) (same); *United States v. Ricks*, 756 F. App'x 488 (5th Cir. 2019) (per curiam) (same); *United States v. Clay*, 921 F.3d 550 (5th Cir. 2019) (same); *United States v. Bullard*, 765 F. App'x 81 (5th Cir. 2019) (per curiam) (same); *United States v. Robinson*, 769 F. App'x 140 (5th Cir. 2019) (per curiam) (same); *United States v. Patton*, 750 F. App'x 259 (5th Cir. 2018) (per curiam) (same); *United States v. Garcia Licon*, No. 17-10679, 2018 WL 6524002 (5th Cir. July 24, 2018) (same); *United States v. Taylor*, 873 F.3d 476 (5th Cir. 2017) (same); *In re Simpson*, 555 F. App'x 369 (5th Cir. 2014) (per curiam) (authorizing successive petition based on *Miller v. Alabama*, 567 U.S. 460 (2012)); *In re Clark*, 554 F. App'x 276 (5th Cir. 2014) (per curiam) (same) *In re Sparks*, 657 F.3d 258 (5th Cir. 2011) (per curiam) (authorizing successive petition based on *Graham v. Florida*, 560 U.S. 48 (2011)).

First, the inadequacy or ineffectiveness of § 2255 does not turn on whether a prisoner will win. *But see Reyes-Requena*, 243 F.3d at 904 (finding § 2255 to be inadequate because a federal prisoner would remain in prison). The savings clause does not say anything at all about inadequate or ineffective "relief"—that is, whether the prisoner wins a vacatur order of some kind. All § 2255(e) says is that a federal prisoner must have the "remedy"—that is, the means—to "*test* the legality of his detention" using § 2255. If he can so "test," then no resort to § 2241 can be had. *See Prost*, 636 F.3d at 584 ("[T]he clause is concerned with process—ensuring the petitioner an *opportunity* to bring his argument—not with substance—guaranteeing nothing about what the *opportunity* promised will ultimately yield in terms of relief.").

Second, a contrary holding creates all sorts of anomalies. Take the statute of limitations for example. AEDPA imposes a one-year limitations period on federal prisoners. *See* 28 U.S.C. § 2255(f). Does that mean that § 2255 is inadequate or ineffective as to every prisoner who files after the 365th day? Of course not. *See Molo v. Johnson*, 207 F.3d 773, 775 (5th Cir. 2000) (per curiam); *Bell v. Holder*, 488 F. App'x 822, 823 (5th Cir. 2012) (per curiam). Why? Because "nothing prevent[s]" a prisoner "from filing a [motion] before the limitations period expire[s]," thus he has an opportunity to adequately and effectively test his conviction. *Molo*, 207 F.3d at 775. Anyone who misses the statute of limitations window simply didn't choose to take advantage of the opportunity that Congress provided. *Cf. Helstoski v. Meanor*, 442 U.S. 500, 505 (1979) (denying mandamus because a direct appeal remained an "adequate means" of seeking relief despite being barred by statute of limitations (quotation omitted)).

Third, far from prohibiting statutory claims, § 2255 expressly authorizes them. *See* 28 U.S.C. § 2255(a) (authorizing claims that a conviction or sentence violates the "laws of the United States"); *see also*

*Davis v. United States*, 417 U.S. 333, 346–47 (1974). Again, *Bousley* proves this proposition. The prisoner in that case filed his statutory claim in his first § 2255 motion. *See* 523 U.S. at 617. Section 2255 would not have become inadequate if Bousley had failed to raise his *Bailey* claim in that first motion,[7] just as § 2255 would not have become inadequate if Bousley had tried to raise his *Bailey* claim a day too late.

Fourth, § 2255 does not become "inadequate or ineffective" because a new Supreme Court precedent came down after a prisoner filed his first § 2255 motion. *See Bousley*, 523 U.S. at 623 (explaining that an on-point Supreme Court decision issued after default had no effect because "futility cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time" (quotation omitted)). Obviously, it becomes far easier to raise an argument after the Supreme Court tells us it's a winner. But the savings clause does not turn on ease of use. As long as the sentencing court still exists, the prisoner *could* use § 2255 to raise any claim he wanted—even in the absence of any precedent whatsoever. The prisoner can *even* use § 2255 to raise claims that are losers (under then-current precedent). *See, e.g.*, *United States v. Morales-Rico*, No. 03-CR-281, 2007 WL 470678, at *4 (S.D. Tex. Feb. 9, 2007) (noting prisoner used § 2255 to raise "his claim that the Supreme Court's decision in [*Almendarez-Torres v. United States*, 523 U.S. 224 (1998),] was wrongly decided, and should be overruled"). The only question under the savings clause is whether these

---

[7] We know that's true because the Supreme Court did not grant relief to Bousley. *See* 523 U.S. at 623. Instead, it held that Bousley had procedurally defaulted his *Bailey* claim by not raising it on direct appeal. *Ibid.* And the Court remanded for additional proceedings to consider whether or not his procedurally defaulted claim may otherwise survive because he was "factually innocent." *Id.* at 624. This proceeding allowed the Government to present any admissible evidence to prove that Bousley did in fact commit the § 924(c) crime, even if Bousley was convicted under the erroneous (read: non-*Bailey*) legal definition of "use."

arguments are "*permissible*" bases for testing prisoners' convictions or sentences. *See Brown*, 719 F.3d at 597 (statement of Easterbrook, C.J.) (emphasis added). They're plainly permissible. And prisoners use them to test their convictions and sentences all the time.

Fifth, the limits on second-or-successive § 2255 motions in subsection (h) do nothing to make § 2255 inadequate or ineffective. Those limits have deep roots in the abuse-of-the-writ doctrine that evolved from common law. *See McCleskey*, 499 U.S. at 489. Under that doctrine, we've held that "a prior unsuccessful [§] 2255 motion is insufficient, in and of itself, to show the inadequacy or ineffectiveness of the remedy." *Pack v. Yusuff*, 218 F.3d 448, 452 (5th Cir. 2000) (quotation omitted); *see also Walker v. United States*, 429 F.2d 1301, 1303 (5th Cir. 1970) (per curiam) ("He cannot satisfy this requirement by merely showing that his previous § 2255 [motion] was unsuccessful."); *Birchfield v. United States*, 296 F.2d 120, 122 (5th Cir. 1961) ("The fact that at least two proceedings under § 2255 have previously been filed, and that after hearings the sentencing court has denied them on the merits does not itself establish the inadequacy of the remedy so as to permit habeas corpus."). AEDPA codified part of that doctrine:

> [AEDPA's] new restrictions on successive petitions constitute a modified res judicata rule, a restraint on what is called in habeas corpus practice 'abuse of the writ.' In *McCleskey* [], we said that the doctrine of abuse of the writ refers to a complex and evolving body of equitable principles informed and controlled by historical usage, statutory developments, and judicial decisions. The added restrictions which the Act places on second habeas petitions are well within the compass of this evolutionary process . . . .

*Felker*, 518 U.S. at 664 (quotation omitted). How can Congress enact a provision that fits comfortably within the historical basis for testing the

legality of a prisoner's custody, yet also provide a remedy that's inadequate for that purpose? Obviously, it cannot.

Sixth, we can't hold § 2255 inadequate or ineffective because doing so would render § 2255(h) meaningless. Congress enacted specific procedural requirements for § 2255 motions. We cannot simply ignore them. *See Pack*, 218 F.3d at 453 ("A ruling that the section 2255 remedy was inadequate or ineffective . . . simply because the petitioner's prior section 2255 motion was unsuccessful . . . would render those procedural requirements a nullity and defy Congress's clear attempt to limit successive habeas petitions."). By reading § 2255(h) not to apply where Congress expressly said it should, *Reyes-Requena* pits the statute against itself. *See McCarthan*, 851 F.3d at 1090 ("[T]o read the bar on successive motions (or other procedural bars to relief) to trigger the saving clause makes the statute self-defeating.").

Seventh, finally, and most importantly, *Reyes-Requena* violates the separation of powers. A panel of our court rewrote § 2255 to say that habeas claims are allowed when "the remedy by [second or successive] motion [for a claim of statutory interpretation]" is "inadequate or ineffective." *Reyes-Requena*, 243 F.3d at 904. But it's not our job to rewrite statutes—it's Congress's. *See McCarthan*, 851 F.3d at 1090 ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied." (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001))). That is especially true in the area of habeas corpus, where legislatures have defined the scope of the remedy since Magna Carta. *See* Part I, *supra*. We do a disservice to the storied pedigree of the Great Writ—and the complicated policy choices that Congress must make—when we take over the statute-writing task. *See Prost*, 636 F.3d at 582–84 (describing the difficult policy choices); Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U. Chi. L. Rev. 142, 146–51 (1970)

(proposing solutions); KING & HOFFMAN, *supra*, at 121 (proposing different solutions). As Judge Thapar put it:

> Our Founders, who knew that "public Virtue is the only Foundation of Republics," believed in the greatness of the American people. They trusted the people's representatives to weigh competing interests and make difficult policy choices. That's why they tasked Congress with making the laws and gave life-tenured judges the more modest job of applying them.

*Wright*, 939 F.3d at 706–07 (Thapar, J., concurring) (quoting *Letter from John Adams to Mercy Warren* (Apr. 16, 1775), *in* 1 THE FOUNDERS' CONSTITUTION 670, 670 (Philip B. Kurland & Ralph Lerner eds., 1987)); *see also Loumiet v. United States*, 948 F.3d 376, 383–84 (D.C. Cir. 2020) (Katsas, J.), *cert. denied*, No. 19-1259, 2020 WL 3492762 (U.S. June 29, 2020) (noting "Congress is the body charged with making the inevitable compromises required" for policy choices (quotation omitted)).

*    *    *

*Reyes-Requena* deviated from these principles. And its mistakes cast long shadows over the work of this court because we continue to apply its *ratio decidendi* every day in deciding second-or-successive motions. In an appropriate case, we should overrule it.